313 Ga. 345
FINAL COPY

S21A1183. BRENNAN v. THE STATE.

LaGrua, Justice.

Appellant Erica Brennan was convicted of felony murder and other crimes in connection with the scalding death of her eight-year-old stepdaughter, Sarah Harris. On appeal, Appellant contends: (1) the trial court erred by conducting a pre-trial conference pursuant to Uniform Superior Court Rule ("USCR") 33.5 (B) outside her presence in violation of her federal and state constitutional rights; (2) the trial court erred by initiating an ex parte conversation with the lead detective, and by failing to disclose this conversation to counsel; and (3) her second-chair counsel rendered ineffective assistance by being mentally and physically incapable of assisting in Appellant's trial.[1] For the reasons explained below, we affirm.

---

[1] The crimes occurred on July 6, 2007. On January 8, 2008, a Long County grand jury indicted Appellant for malice murder, two counts of felony murder, cruelty to children in the first degree, and aggravated battery. On

1. The evidence presented at trial showed the following. In July 2007, Appellant was married to Russell Brennan. They lived together with Harris, who was Brennan's daughter, as well as Appellant's seven-year-old son. At the time, Brennan was a sergeant in the United States Army, stationed at Fort Stewart but deployed to Iraq. On the night of July 6, Brennan was en route home for two weeks of leave.

On July 6 around 4:30 p.m., Appellant called her friend, Jennifer Madron, whose husband was also stationed at Fort Stewart and deployed to Iraq. According to Madron, Appellant invited Madron and her children to Appellant's house to go swimming, but

January 28, 2008, the State filed its notice of intention to seek the death penalty. On April 1, 2010, the State withdrew its intention to seek the death penalty. At a trial from April 5 to 8, 2010, the jury found Appellant not guilty of malice murder but guilty of the remaining counts. Appellant was sentenced to serve life in prison for felony murder and 20 years in prison for aggravated battery to be served concurrently; the remaining counts were merged for sentencing purposes. Appellant filed a timely motion for new trial, which was amended on February 20, 2019. On September 20, 2019, the trial court held an evidentiary hearing on the motion for new trial. After the hearing, supplemental briefs were filed by Appellant and the State. On April 21, 2021, the trial court denied Appellant's amended motion for new trial. Appellant filed a timely notice of appeal, and the case was docketed to this Court's August 2021 term and submitted for a decision on the briefs.

Madron declined. Around 7:30 p.m., Appellant called Madron, and they had a 15- to 20-minute friendly, normal conversation. Ten minutes later, Appellant called Madron, said Harris had been burned, and asked for advice on how to "ease the pain." Madron, assuming Harris had been sunburned while at the pool earlier that day, recommended pouring canned milk on Harris's burns. Appellant then poured canned milk on Harris. Around 8:00 p.m., Appellant called Madron and said Harris's "skin was falling off." During this phone call, Madron heard Harris crying in the background. Appellant and Madron agreed to meet in a parking lot at Fort Stewart.

After parking their cars, Appellant walked around to her passenger door, said to Madron, "Look what [Harris] did," and opened the passenger door. Harris was sitting in the car, whimpering and crying, wearing shorts and a shirt, and "[a]ll her skin was gone." Madron insisted that Appellant take Harris to the hospital. Appellant disagreed and wanted to treat Harris's burns herself. Madron threatened to call the military police, and Appellant

3

eventually agreed to take Harris to the hospital. Madron agreed to pick up Appellant's son.

While leaving Fort Stewart, Madron was pulled over by the military police for using her cell phone while driving. Madron explained the situation concerning Harris to the military police officer and requested the U. S. Army Criminal Investigation Division ("CID") be sent to the hospital to investigate. The military police officer told Madron that she would make sure CID went to the hospital.

While Madron was picking up Appellant's son, Appellant carried Harris into the emergency room of the Fort Stewart hospital. Hospital staff observed burns on 75 to 80 percent of Harris's body; Harris had no burns on her face, upper chest, or knees. Harris had third-degree burns on her feet; the burns on the rest of her body were between second- and third-degree burns. Harris's burns were "clearly demarcated," meaning "that they were clearly visible, not in an erratic pattern, but a clear pattern." Harris had "stocking burns" on her feet meaning there was a clear line of demarcation

4

demonstrating that her feet burned for longer than the rest of her body. Harris also had some bruising on her lower abdomen and left thigh; she was alert and complained about the pain she was experiencing.

Appellant told a nurse that Harris had obtained the bruises from "roughhousing" with Appellant's son. Appellant had directed Harris to take a bath, and she later found Harris lying in the water. Appellant stated that her husband had set the water heater at 180 degrees, and Appellant never changed it. The nurse further testified that Appellant was preoccupied with who was going to pick up her husband from the airport that night.

While at the hospital, Appellant met with a Georgia Division of Family and Children Services caseworker. Appellant told the caseworker that she had directed Harris to take "a hot shower," and that Harris "ran her own bathwater." Appellant also stated that there had been "problems gauging the temperature of the water," and she had reported it to the landlord. Appellant further stated she was having problems with Harris and that "when [Harris] has

5

contact with her bio[logical] mother,"[2] Harris "acts out" by biting her nails and pulling her hair out.

A military police officer also spoke with Appellant at the hospital, and he testified that he had not observed any burns on Appellant's hands or arms that night. Sometime that evening, Harris was transported to an Augusta hospital for more specialized care.

Around 9:00 p.m., Appellant called Stacy McBride[3] and told McBride that Brennan was going to kill her because Harris "had an accident." Specifically, Appellant told McBride that she had directed Harris "to run herself a warm bath" and had "third-degree burns over 80 percent of her body." During the course of the evening, Appellant made 10 to 12 calls to McBride. During these calls, Appellant: (1) informed McBride that Harris was transferred and asked "if it would look bad if she didn't go" to the Augusta hospital;

---

[2] At trial, Harris's biological mother testified that she was in jail on the night of July 6, and she did not speak with her daughter that day.

[3] McBride's husband was the commander of Sergeant Brennan's military unit and was responsible for the support system involving military families.

(2) requested that Brennan's flight be rerouted to Augusta; (3) explained that Harris was bruised when Appellant "thr[ew] [Harris] in the air" while in the pool and "grabbed [Harris] by her stomach midsection" to prevent her from swallowing too much water; (4) stated that "[Harris] had overheard a conversation that [Appellant] was having . . . about [Harris's] biological mother being in jail,"[4] which "set [Harris] off to misbehave"; and (5) stated that Harris "had intentionally done this in order to ruin the rest and relaxation time that she was to spend with [Brennan] and that [Harris was] always acting out and doing things and misbehaving and this all was [Harris's] fault."

The lead detective met with Appellant at the Fort Stewart hospital. Appellant told the lead detective that Harris "had gotten into a tub of water and had caused herself to be burned" and that Harris had done so because when Harris "hear[s] from or g[ets] on the phone with her biological mother, she would act out." Appellant

---

[4] At trial, Madron testified that she and Appellant never discussed Harris's biological mother during their phone calls on July 6.

7

consented to law enforcement officers searching her house, and she and the lead detective agreed to meet there after Appellant retrieved her keys from Madron.

While at Madron's house, Appellant stated to her that "[Harris] was going to ruin her [leave] with [Brennan]" and that "[Harris] wasn't the angel that everybody thought she was, that she was a little demon child." When Madron asked about Harris's burns, Appellant stated, "[Harris] was on the phone with her mom, Christy, and, when she got off the phone, she was acting strange and that she went and ran the bathtub water and just laid in it."

Upon arrival at Appellant's house, the lead detective observed empty containers of canned milk in the trash can, residue from the canned milk in the bathtub and sink, and that the water heater was set between 130 and 135 degrees. Appellant told the lead detective that Harris was bruised when Appellant was "throwing [Harris] up and catching her" in the pool. Appellant further stated she drew Harris a bath to help alleviate the bruising, and she later found Harris "lying on her back" in the water. Appellant also reiterated

her earlier statement to the lead detective that Harris "acted out and would bite herself and she would do this after talking with her real mother."

The next day, Brennan reported the water heater to the landlords, who turned down the temperature on the water heater to an unspecified degree.[5] Shortly thereafter, the lead detective and other law enforcement officers went to Appellant's house to look at the water heater again. The lead detective turned the water heater back up to 130 to 135 degrees, and noted that the water flowing out of a faucet registered at 140 degrees.

Harris died on July 15. According to the medical examiner, Harris died of thermal burns due to scalding. The medical examiner found no trauma or wounds other than scalding.

After Harris's death, Appellant was arrested. A fellow inmate testified at trial that she and Appellant spoke about this case while Appellant was in custody. According to the inmate, Appellant

---

[5] At trial, the husband-and-wife landlords testified they had not previously received any complaints about Appellant's water heater.

9

explained she thought "heat would take away the bruise," and said, "[T]he baby is dead. Oh, well."

At trial, the medical examiner testified that Harris suffered immersion burns, and he explained that "[a]n immersion burn occurs when somebody is forced into the water, and it's characterized by symmetrical burning over the area of the body as opposed to a splash burn . . . [like] if you walked into a shower that was too hot, we don't expect to see burns on one side of the body." He further explained that evidence-based practice and research says that "lines of clear demarcation" are consistent with submersion and child abuse. The nurse and doctor who treated Harris at the Fort Stewart hospital also testified that Harris's burns were consistent with child abuse. Specifically, the doctor testified that clear lines of demarcation are "a very typical presentation in child abuse cases when somebody is held and put into the water."

At trial, the defense medical expert testified that Harris's immersion burns, and the lack of splash burns on both Harris and Appellant, were inconsistent with the State's theory of intentional

child abuse because child immersion burns typically involve an infant or small child and "when you immerse that [type of] child, you can hold them [without] much defense action on the part of the child." In contrast, he testified that an eight-year-old child "is going to put up a much harder struggle," and, "if the child were intentionally placed in the water, certainly, the legs would start drawing up, and you'd see some movement of the legs, and then you would expect to see some splashing at that point in time."

The defense also presented a thermal engineering expert who testified that when Appellant's water heater is set to 130 to 135 degrees, the water flows out of faucets about ten degrees hotter. The Fort Stewart hospital doctor testified it takes two to four seconds to sustain second-degree burns in 130-degree water and over five seconds to sustain third-degree burns, and it would take one-and-a-half to two seconds to sustain third-degree burns in 150-degree water.

2. On appeal, Appellant contends that the trial court erred by

11

conducting a pre-trial conference under USCR 33.5 (B)[6] outside her presence in violation of her federal and state constitutional rights. We disagree.

(a) We note first that the pre-trial conference in this case was not reported by a court reporter. Thus, all the evidence concerning the conference comes from testimony at the motion for new trial hearing.

Appellant's lead counsel testified that prior to trial, the State and Appellant reached a tentative plea agreement whereby the State would withdraw its notice of intention to seek the death

---

[6] Rule 33.5 (B) provides:

If a tentative plea agreement has been reached, upon request of the parties, the trial judge may permit the parties to disclose the tentative agreement and the reasons therefor in advance of the time for the tendering of the plea. The judge may then indicate to the prosecuting attorney and defense counsel whether the judge will likely concur in the proposed disposition if the information developed in the plea hearing or presented in the presentence report is consistent with the representations made by the parties. If the trial judge concurs but the final disposition differs from that contemplated by the plea agreement, then the judge shall state for the record what information in the presentence report or hearing contributed to the decision not to sentence in accordance with the plea agreement.

penalty and Appellant would plead guilty to voluntary manslaughter for a total sentence of 20 years with fewer than 20 years to serve in prison.[7] Counsel for the parties then approached the trial court pursuant to USCR 33.5 (B) to see if it would accept the tentative plea agreement. The following persons were present in the room for the USCR 33.5 conference: the trial judge, the District Attorney, and Appellant's lead and second-chair counsel. Appellant was not present.

The lead detective testified that he was informed by a sheriff's deputy that the attorneys were discussing a plea agreement with the judge, and he walked over to the courthouse and joined the USCR 33.5 conference. Appellant's lead counsel and the lead detective testified that after counsel for the parties presented their tentative plea agreement to the judge, the lead detective argued against the proposed agreement. The trial judge indicated that he

---

[7] Appellant's lead counsel testified that he could not remember the exact amount of time Appellant would have to serve in prison, but it was fewer than 20 years, which is the maximum sentence for voluntary manslaughter. See OCGA § 16-5-2.

13

rejected the tentative plea agreement, although the lead detective testified he left the room prior to the judge announcing his decision.

(b) "Under both the federal and state Constitutions, a criminal defendant has a right to be present during critical stages of [her] trial." *Allen v. State*, 310 Ga. 411, 418 (5) (851 SE2d 541) (2020).[8] A "critical stage" is "one in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way." Id. (citation and punctuation omitted).

Whether a conference under USCR 33.5 qualifies as a critical stage of a criminal proceeding is a matter of first impression, and an examination of this rule is necessary. USCR 33.5 begins by stating, "The trial judge should not participate in plea discussions." USCR

---

[8] Under the Georgia Constitution, "if an appellate court determines that the defendant's right to be present was violated without his acquiescence or other waiver, prejudice is conclusively presumed and [the defendant's] convictions must be reversed." *Champ v. State*, 310 Ga. 832, 845 (2) (c) (854 SE2d 706) (2021). "Georgia law is unusual in applying this conclusive presumption of prejudice for an unwaived violation of a constitutional right to be present. The United States Supreme Court has held that a violation of the right to be present under the United States Constitution is subject to constitutional harmless error review." Id. at n.10.

14

33.5 (A). This prohibition exists because a trial judge's "participation in the plea negotiation may skew the defendant's decision-making and render the plea involuntary." *McDaniel v. State*, 271 Ga. 552, 554 (2) (522 SE2d 648) (1999).

USCR 33.5 (B) then explains what parties may do when "a tentative plea agreement has been reached." Specifically, parties may request disclosure of the tentative plea agreement to the judge, and the judge "may permit the parties to disclose the tentative agreement and the reasons therefor in advance of the time for the tendering of the plea." USCR 33.5 (B). Thus, the rule anticipates this disclosure will occur prior to the formal tendering of a guilty plea. See *Undisclosed LLC v. State*, 302 Ga. 418, 420 (2) (a) (807 SE2d 393) (2017) (construing court rules according to their plain and ordinary meaning). And, here, when Appellant's lead counsel was questioned on whether a court reporter was present for the pre-trial conference, he testified, "No, I don't believe there was a court reporter in there. Again, we were just doing the informal, under the [U]niform [S]uperior [C]ourt [R]ules, having the plea conference."

15

Notably, the rule does not dictate the form of this disclosure (e.g., in-person, by remote videoconference, by filing or other written correspondence to the court, or some other method). After a disclosure by the parties, "[t]he judge may then indicate to the prosecuting attorney and defense counsel whether the judge will likely concur in the proposed disposition *if the information developed in the plea hearing or presented in the presentence report is consistent with the representations made by the parties.*" USCR 33.5 (B) (emphasis supplied). Again, the rule anticipates that the parties' disclosure to the judge will occur prior to the formal tendering of the guilty plea. And, at the formal tendering of the guilty plea, when the defendant unquestionably must be present, information or evidence may be presented which is different than that which was disclosed by the parties. We note that under this rule a judge is not required to provide the parties with an indication of the likelihood that he or she will accept a tentative plea agreement. See *Carr v. State*, 301 Ga. 128, 130 (3) (799 SE2d 175) (2017) ("Nor was the trial court required to provide the parties with an indication of the likelihood

16

that — after a plea hearing — it would look favorably upon a certain proposed sentence.").

The remainder of USCR 33.5 then provides as follows:

> (B) . . . If the trial judge concurs but the final disposition differs from that contemplated by the plea agreement, then the judge shall state for the record what information in the presentence report or hearing contributed to the decision not to sentence in accordance with the plea agreement.
> (C) When a plea of guilty or nolo contendere is tendered or received as a result of a plea agreement, the trial judge should give the agreement due consideration, but notwithstanding its existence, must reach an independent decision on whether to grant charge or sentence leniency under the principles set forth in [USCR 33.6].

Thus, USCR 33.5 merely provides that parties may or may not disclose a tentative plea agreement to the trial judge, and the judge may or may not indicate whether he or she "will likely concur in the proposed disposition if the information developed in the plea hearing or presented in the presentence report is consistent with the representations made by the parties." Moreover, even if the trial judge does indicate that he or she will likely concur in the tentative plea agreement, the judge can still depart from that determination

17

as long as the judge explains his or her reasons based on information provided prior to or at the plea hearing. Here, the trial judge indicated that he rejected the tentative plea agreement.

After the judge offers his or her indication or declines to indicate, the defendant still has a choice on whether to tender a guilty plea. If he or she chooses to enter a guilty plea, USCR 33.5 contemplates the formal tendering of a guilty plea at which the defendant will be present. And USCR 33.6 through 33.12 govern the formal tendering of a guilty plea as well as any withdrawal of the plea.[9] It is USCR 33.10 that governs a trial court's formal rejection of a proposed plea agreement:

> If the trial court intends to reject the plea agreement, the trial court shall, on the record, inform the defendant personally that (1) the trial court is not bound by any plea agreement; (2) the trial court intends to reject the plea agreement presently before it; (3) the disposition of the present case may be less favorable to the defendant than that contemplated by the plea agreement; and (4) that the defendant may then withdraw his or her guilty plea as a matter of right. If the plea is not then withdrawn, sentence may be pronounced.

---

[9] This is in addition to the relevant statutes and case law.

An indication by the trial court, under USCR 33.5 (B), that it "will [not] likely concur" with the parties' tentative plea agreement at the formal tendering of a guilty plea is separate from USCR 33.10 because the trial court is not formally rejecting the tentative plea agreement. Thus, it is clear that at the USCR 33.5 conference, the trial judge is merely providing an indication as to what may occur at a formal tendering of the guilty plea, provided that "the information developed in the plea hearing or presented in the presentence report is consistent with the representations made by the parties." USCR 33.5 (B). Put simply, a USCR 33.5 conference gives the parties a preview of how the trial judge may likely rule at a separate, subsequent USCR 33.10 formal guilty plea hearing at which the defendant is required to be present.

Moreover, there is nothing in the court rules, relevant statutes, or case law prohibiting a defendant from tendering a guilty plea even after the trial judge provides his or her initial indication concerning the parties' tentative plea agreement. In fact, the evidence in this case shows that the parties disclosed a second

19

tentative plea agreement to the trial judge in this case.[10] And, there is nothing prohibiting a defendant from presenting evidence at the formal tendering of the guilty plea which is different from, or in addition to, that which was presented in the parties' initial disclosure. USCR 33.5 (B) specifically contemplates "information developed at the plea hearing[.]"

Accordingly, we conclude that disclosure of a tentative plea agreement at a conference under USCR 33.5 is not a critical stage for the following reasons: (1) a defendant's rights cannot be lost because a defendant has no right to enter a guilty plea;[11] (2) a defendant's defenses or privileges cannot be waived because there is no impact on a defendant's opportunity to defend against the

---

[10] The details of the second tentative plea agreement were that Appellant would plead guilty to voluntary manslaughter and receive 20 years in prison. Appellant's lead counsel testified that at this second disclosure the trial judge stated: "[T]here is no set of facts you can tell me that's going to make out a case for voluntary manslaughter. I'm not going to accept it. The jury is going to have to do that. I'm not taking this plea, period." Appellant raises no enumeration of error concerning this second disclosure of a tentative plea agreement.

[11] See *Carr*, 301 Ga. at 130 (3) (defendants have no right to enter a guilty plea). Additionally, as noted earlier, there is nothing prohibiting a defendant from formally tendering a guilty plea after a trial judge provides his or her indication to the parties.

charges;[12] and (3) the outcome of the case cannot be *substantially* affected in some other way because (a) a defendant still retains the option to formally tender a guilty plea, and (b) a defendant can still proceed to trial and raise any and all permissible defenses and privileges during trial. See *Kesterson v. Jarrett*, 291 Ga. 380, 384 (2) (a) n.1 (728 SE2d 557) (2012) ("[T]he exclusion of a party from proceedings with the jury at trial . . . is at the core of the right to be present."). We therefore conclude that a disclosure of a tentative plea agreement by counsel for the parties under USCR 33.5 is not a critical stage for which a defendant has the right to be present under the United States Constitution or the Georgia Constitution.

3. Appellant next contends that the trial court erred by initiating an ex parte conversation with the lead detective and by failing to disclose this conversation to counsel. Appellant further

---

[12] We note that a defendant waives certain defenses and privileges by formally entering a guilty plea, but no defenses or privileges are waived by disclosing a tentative plea agreement to a trial judge. See OCGA § 24-4-410 (3) and (4) (concerning the inadmissibility of any statements "made in the course of plea discussions" and "made in the course of any proceedings in which a guilty plea . . . was entered and was later withdrawn . . .").

21

contends that, had the trial court disclosed this conversation to counsel, "it would have resulted in recusal of the trial judge from conducting Appellant's trial."[13] For the reasons explained below, this claim fails.

Regarding the ex parte conversation that the trial judge initiated with the lead detective, the lead detective testified at the motion for new trial hearing as follows:

> The day of the trial, [I] got into the courtroom, Frankie Milton, who was the clerk of the court at the time, says, "Judge Cavender wants to see you." I said, "Okay."
> So I went in and saw Judge Cavender, and I says, "You wanted to see me, Your Honor?" He said, "Yes, sir." He said, "I just wanted you to know I was a bad guy today." And I said, "I don't understand what you're saying." He said, "Well, they wanted to plead her for 20, and I told them we had a jury." That's what Judge Cavender said to me.

The lead detective further testified that this conversation happened in chambers, and no one else was present.

Former Canon 3 (B) (7) (now Rule 2.9 (A)) of the Georgia Code

---

[13] Appellant does not contend that the trial judge erred by failing to voluntarily disqualify himself.

of Judicial Conduct[14] and USCR 4.1[15] prohibit judges from initiating certain ex parte communications.[16] While we are troubled by the judge's initiation of an ex parte communication with the lead detective, we conclude that there is no basis for the grant of a new trial because Appellant has not shown prejudice regarding either the initiation of the ex parte communication, or the failure to

---

[14] Former Canon 3 (B) (7), in effect at the time of trial, read: "Judges shall not initiate or consider ex parte communications, or consider other communications made to them outside the presence of the parties concerning a pending or impending proceeding, except [under limited circumstances not applicable here]."

[15] "Except as authorized by law or by rule, judges shall neither initiate nor consider ex parte communications by interested parties or their attorneys concerning a pending or impending proceeding."

[16] We note that:

> With certain exceptions, [former] Canon 3 (B) (7) [now Rule 2.9 (A)] forbids a judge to initiate or consider an ex parte communication, but [former] Canon 3 (B) (7) [now Rule 2.9 (A)] says nothing about disqualification. When a judge has taken part in an ex parte communication in violation of [former] Canon 3 (B) (7) [now Rule 2.9 (A)], whether the violation requires the disqualification of the judge must be assessed under [former] Canon 3 (E) [now Rule 2.11].

*State v. Hargis*, 294 Ga. 818, 822 (1), n.10 (756 SE2d 529) (2014). Former Canon 3 (E) (1) (a), in effect at the time of trial, read: "Judges shall disqualify themselves in any proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where: . . . the judge has a personal bias or prejudice concerning a party[.]" The commentary to this rule provided, "Judges should disclose on the record information that the court believes the parties or their lawyers might consider relevant to the question of disqualification, even if they believe there is no legal basis for disqualification."

disclose it. See, e.g., *Fuller v. Fuller*, 279 Ga. 805, 806 (1) (621 SE2d 419) (2005) (affirming the trial court's order because "even if [the judge's] communications [with the plaintiff's counsel] were prohibited due to their ex parte nature, they did not harm [the defendant]"); *Crowe v. State*, 265 Ga. 582, 585 (2) (458 SE2d 799) (1995) (holding that the defendant "has not shown that he was in any way prejudiced by" the trial judge's failure to immediately disclose his ex parte communications with the defendant to counsel); *Ivey v. Ivey*, 264 Ga. 435, 438 (3) (445 SE2d 258) (1994) (holding "no harmful error" where there was "no indication in the record that the trial court gave any consideration to the ex parte communications" that it received).

When the judge initiated the ex parte conversation with the lead detective, he merely informed the lead detective of his decision to not accept the parties' negotiated plea agreement, and the parties had already been informed of this decision. See *Fuller*, 279 Ga. at 806 (1) (any error in the trial court's initiation of an ex parte communication with counsel was determined to be harmless, in

24

part, because the trial court had already made its decision); *Crowe*, 265 Ga. at 585 (2) (any error in the timing of the trial court's disclosure of an ex parte communication was determined to be harmless because the defendant had not shown he was prejudiced by the timing). Further, Appellant has not shown that the judge's disclosure of this conversation would have resulted in recusal. See *Ford v. Tate*, 307 Ga. 383, 422 (II) (E) (835 SE2d 198) (2019) (speculation is insufficient to show that the trial judge was biased or that his impartiality could reasonably be questioned). Accordingly, we conclude Appellant has failed to show the required prejudice, and therefore, this claim fails.

4. Appellant next contends her second-chair counsel rendered constitutionally ineffective assistance by being mentally and physically incapable of assisting in Appellant's trial. We disagree.

(a) At trial, Appellant was represented by three attorneys: (1) Gerald Word, then-Director of the Office of the Georgia Capital Defender, as lead counsel; (2) Charles Nester, as second-chair counsel; and (3) Sharon Schiavetti, as third-chair counsel. Word

25

conducted voir dire; he presented the opening statement and closing argument; he conducted cross-examination of all the State's witnesses; he moved for a directed verdict of acquittal; he conducted direct examination of the landlords and the defense medical expert who testified about Harris's burns; and he voiced nearly all of the defense objections. While Nester conducted the direct examination of the defense engineering expert, Word conducted the re-direct examination of him. Schiavetti conducted the direct examination of the military police officer who testified he did not observe burns on Appellant's hands and arms.

At the motion for new trial hearing, Word, Schiavetti, and the defense investigator testified that Nester would fall asleep during trial. Word also testified that they "were having issues with [Nester] prior to trial with just some cognitive issues that were difficult to define at the time," and "[t]here were complaints that started originating prior to trial." Ultimately, Nester was fired from the Capital Defender's Office sometime after Appellant's trial. Nester's wife testified at the motion for new trial hearing that Nester's

cognitive decline began "around 2011, maybe somewhere around there."

While Appellant fails to identify any specific deficiencies in Nester's performance at trial, she does refer to Nester's "disjointed examination" of the defense engineering expert. At trial, Nester presented the defense engineering expert, qualified him as an expert in the field of thermal engineering, and established that he had examined Appellant's water heater. After Nester questioned the defense engineering expert about the basics of the water heater, the following colloquy occurred:

> [PROSECUTOR]: Your Honor, may I — just by way of suggestion rather than objection, could we — if I have any questions on these — on one of them — and there may not be that many — but we agreed to let me do the cross[-examination] right then rather than having to put [the pictures] back up.
> MR. WORD: That's fine with me if it's —
> [PROSECUTOR]: Is it all right with the judge?
> COURT: That'll be fine.
> MR. NESTER: That's fine with me, Your Honor.

The prosecutor then cross-examined the defense engineering expert on the basics of the water heater. When the prosecutor

finished, Nester restarted his direct examination. Whenever the defense engineering expert testified about a specific component or condition of the water heater on direct examination (e.g., control power transformer, temperature recording device, the thermostat and its clips, corrosion product, the temperature relief valve, and access cover), Nester would conduct the direct examination on that component followed by the prosecutor's cross-examination of that component.[17]

Nester elicited testimony from the defense engineering expert that when Appellant's water heater's thermostat was set to 130 degrees, and the access cover was removed, the water immediately flowing from the water heater registered at 168 degrees.[18] The State then elicited testimony from the defense engineering expert that when the water heater's thermostat was set to 130 to 135 degrees, and the access cover remained intact, the water flowing from the

---

[17] There were times the prosecutor had no questions about the various components of the water heater.

[18] A photograph taken by law enforcement officers on the night of July 6 shows that the water heater's access cover was removed.

water heater only registered 10 degrees hotter. After Nester finished his direct examination, the prosecutor had no further questions, and the trial recessed for lunch. After the recess,[19] Word recalled the defense engineering expert, and elicited testimony from him that when the water heater at Appellant's home was set to 130 to 135 degrees, and the access cover was removed, the water flowing the bathtub faucet registered at 163 to 165 degrees; this three- to five-degree drop in temperature results from the 30-foot distance from the water heater to the bathtub faucet.

In rebuttal, the State called one of the law enforcement officers who reported to Appellant's house on the night Harris was burned. This officer testified that the access cover was on the water heater when he and the lead detective initially looked at it, but they removed the access cover in order to look at the thermostat.

(b) To prevail on her ineffective assistance of counsel claim, Appellant must demonstrate that Nester's performance was

---

[19] At the motion for new trial hearing, Word testified that "it appear[ed] [Nester] was doing a very poor job of handling the witness; and at a break, when we came back in, I took it over."

professionally deficient and that she was prejudiced by his deficient performance. See *Sullivan v. State*, 308 Ga. 508, 510 (2) (842 SE2d 5) (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Appellant must show that Nester performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. To establish prejudice, Appellant must prove that there is a reasonable probability that, but for Nester's deficiency, the result of the trial would have been different. See id. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). And this burden is a heavy one. See *Keller v. State*, 308 Ga. 492, 496 (2) (842 SE2d 22) (2020). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Sullivan*, 308 Ga. at 510 (2) (citation and punctuation omitted).

Assuming without deciding that Nester's performance was

30

deficient, we turn to whether Appellant has demonstrated prejudice, and we conclude that she has not. Appellant argues that, "but for [Nester's] impairment and his disjointed examination of a key witness, there is a reasonable probability that the outcome of her trial would have been different." However, Appellant fails to point to any specific testimony that Nester failed to elicit from the defense engineering expert or to any problematic testimony that Nester elicited from him. "[M]ere speculation on [Appellant's] part is insufficient to establish *Strickland* prejudice." *Henderson v. State*, 310 Ga. 231, 242 (3) (a) (850 SE2d 152) (2020) (citation and punctuation omitted). And, to the extent Nester's direct examination of the defense engineering expert was "disjointed," this was remedied by Appellant's lead counsel conducting a re-direct examination of the defense engineering expert. We therefore conclude that Appellant failed to show prejudice under *Strickland*. See id. ("*Strickland* places a heavy burden on [Appellant] to affirmatively prove prejudice through evidence of a reasonable probability of a different result." (citation and punctuation

31

omitted)). Thus, this ineffective assistance claim fails.

*Judgment affirmed. All the Justices concur.*

Decided February 1, 2022 — Reconsideration denied March 8, 2022.

Murder. Long Superior Court. Before Judge Woodrum, Senior Judge.

*The Roch Law Firm, Donald R. Roch II; Kyle E. Koester*, for appellant.

*Tom Durden, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.