**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 12, 2024**

# In the Court of Appeals of Georgia

A23A1562. YNTEMA v. SMITH.

A23A1660. YNTEMA v. SMITH.

DOYLE, Presiding Judge.

These cases arise in the context of a pending petition for modification of child custody filed in 2017 by Leah Smith ("the Mother") against Howard Yntema ("the Father") following their divorce in 2010. In Case No. A23A1562, Kitty Yntema (the stepmother and the Father's new wife), appeals from the denial of her motion to strike certain provisions of an interlocutory consent order, as amended ("the Consent Order"), agreed to by the Father and the Mother that restricts her speech about the parties and the custody proceedings. Because the Consent Order was overly restrictive as to certain speech, we affirm in part and reverse in part the judgment in that case.

In Case No. A23A1660, the Father appeals from seven orders pertaining to a finding of contempt against him, the failure of the trial judge to recuse, the denial of his motion to vacate or modify the Consent Order, and the sealing of the case. In that case, we affirm in part, vacate in part, and remand.

*Case No. A23A1562*

The relevant record shows that following their divorce in 2010, the Father was awarded primary physical custody of their children, with the Mother receiving weekend and holiday custody. Since that time, the Father married Kitty,[1] and the Father and Mother have both filed petitions for modification of custody; the current petition was filed by the Mother in 2017. As part of those proceedings, temporary consent orders were entered to govern the reunification process with the Mother, who had been subject to a no-contact order since 2016. After various allegations of contempt, a hearing was held in May 2022 regarding allegations of contempt against the Father. At that hearing, the Mother and Father entered into the Consent Order to resolve the issues without further action by the court. Kitty was present at the hearing and was notified by the trial court that the Father and Mother had entered into

---

[1] The Mother also remarried.

an agreement memorialized in the Consent Order that prevented her from disparaging the parties:

> I'm going to need you to review that order because I want you to understand that if you violate the spirit of that order in any way by any slight discouragement, any slight negativity towards [the Mother], anything at all, that I'm going to hold that against your husband and he's going to jail. . . . I think that along [the last seven years] you've made some mistakes that have hurt the boys, not intentionally, but you've hurt them, and now we have a chance to fix those mistakes. . . . So[,] it may not come natural . . . but fake it 'til you make it . . . it will become natural. . . . I really believe that you are sincerely understanding that this needs to happen because I believe that all you've ever wanted is the best for your boys. . . . I need you to stop telling everyone your version of what has happened because that is damaging. . . . I need you to . . . do a 180[,] and if you don't have anything nice to say, say nothing at all. . . .

Kitty acknowledged that she had seen the order and seemed to agree with the trial court's message. The Consent Order was entered in June 2022, and later amended in July 2022.[2]

In part, the Consent Order provided that the Father and Kitty have no contact or communication with the children for at least 90 days, and it contained non-

---

[2] The order was amended again in September 2022, but that amendment did not affect the language at issue in this appeal.

disparagement clauses that restricted the Father, the Mother, and Kitty from speaking negatively about each other and the custody litigation, except in a therapeutic setting. Two paragraphs in particular, 28 and 29, pertained to Kitty as a spouse:

> 28. The parties and their spouses shall not discuss this litigation or any prior alleged negative acts of the other [p]arty or of their spouse with anyone at any time except in a therapeutic setting either with the [family counseling] personnel, the [reunification therapist], or the [p]arties' own personal counselor, or the [children's] individual counselor(s), if one is to be obtained.

> 29. Neither [p]arty nor their spouse shall post, re-post, forward, re-tweet, etc.[,] on social media any information about past, present[,] or future litigation or disparaging information about the other party or their spouse. If either party finds out a friend, associate, or family member posts such information[, the party] shall immediately admonish that person to remove it.

In October 2022, the Mother filed a motion for contempt against the Father, alleging certain violations of the order by the Father and Kitty. In particular, Kitty was alleged to have communicated negatively about the litigation with a friend. The following month, November 2022, Kitty received a witness subpoena directing her to attend a November 18 hearing and bring all records (including texts, emails, and social

media posts) of any of her communications about the case. On the day of the hearing, Kitty filed a motion to strike paragraphs 28 and 29 as they applied to her. Kitty did not challenge other provisions restricting her ability to speak such as having no contact with the children for a rolling 90-day period assessed by the court, a prohibition on disparaging the other parent or spouse,[3] and a prohibition on "interfer[ing] in any way with the children's progress in repairing the damaged relationship with the Mother."

Following a hearing in February 2023 , the trial court denied Kitty's motion to strike paragraphs 28 and 29 of the Consent Order. The trial court issued a certificate of immediate review, and this Court granted Kitty's application for an interlocutory appeal; Kitty then filed a notice of appeal in April 2023.

We note that Kitty's appellate brief recounts that after she filed her notice of appeal, additional proceedings occurred. According to the brief, the trial court scheduled a hearing on an ongoing contempt motion against the Father, and at an unreported call, the court announced that it would entertain a hearing against both the Father and Kitty. Following a hearing in May 2023, the trial court made oral findings

---

[3] The anti-disparagement provisions were structured to prohibit the Father and Mother from allowing their spouses to disparage the parties involved, and they prohibited "the parties" from publishing disparaging remarks in books, magazines, blogs, and newspapers.

of contempt against Kitty but reserved punishment until after the appeal was resolved. A written order entered in May 2023 found that Kitty and the Father acted in concert to violate the Consent Order. It ordered the incarceration of the Father for 90 days, but it does not contain any penalty for Kitty.

Kitty now appeals the denial of her motion to strike paragraphs 28 and 29 of the Consent Order. Specifically, she argues that she lacked sufficient notice and that the paragraphs are unconstitutional prior restraints on her speech.[4] We agree in part.

1. Kitty first argues that the trial court erred by purporting to enforce the Consent Order against her because she was not a party to the proceedings and lacked sufficient notice that she could be held in contempt for violating the Consent Order. With respect to the issue before us — the denial of her motion to strike — we disagree.

As a general matter, Kitty correctly points out that the Consent Order was entered in a custody proceeding in which she was not a named party, and she was not

---

[4] In light of the colloquy between Kitty and the trial court at the May 2022 hearing, it is clear that Kitty had actual notice of the order and that certain provisions would apply to her, even though she was not a party to the custody modification petition.

directly involved in negotiating any provisions that applied to her. And although she received a subpoena to appear as a witness at the contempt proceeding against the Father, Kitty herself had not received a rule nisi notice informing her of the need to defend herself against her own alleged contempt with respect to the Consent Order.[5]

But this appeal is an interlocutory review of the order denying Kitty's motion to strike paragraphs 28 and 29. The record is plain as to Kitty's notice of and ability to challenge those provisions, and she was represented by counsel at a hearing devoted to the issue in February 2023. As noted in the trial court's subsequent order, at the May 2022 hearing, Kitty was personally notified of the contents of the order and of the need for her to abide by it.[6] Finally, the trial court has not entered a final written

---

[5] See generally *Ga. Pain & Wellness Center v. Hatchett*, 368 Ga. App. 215, 219 (1) (888 SE2d 650) (2023) ("[F]or the trial court to obtain personal jurisdiction over the nonparty [in a contempt proceeding], the nonparty *must* be served with some form of summons or the equivalent of it."); *Nadal v. Nadal*, 355 Ga. App. 756, 758 (1) (845 SE2d 727) (2020) ("In cases of constructive contempt of court, such as this, where the alleged contumacious conduct is disobedience to a mandate of the court, not an act in the presence of the court or so near thereto as to obstruct the administration of justice, the law requires that a rule nisi issue and be served upon the accused, giving the accused notice of the charges against [her], and that the accused be given an opportunity to be heard [as to the contempt charges against her].") (punctuation omitted).

[6] See generally *Wilkerson v. Tolbert*, 239 Ga. 702, 704 (238 SE2d 338) (1977) ("'The contemptuous violation of a court order may be punished though the party

order punishing Kitty for any alleged violations of the Consent Order, so we confine our review to the merits of the motion to strike.

2. With respect to the challenge to paragraphs 28 and 29, Kitty argues that they are constitutionally impermissible because they cannot sustain the exacting scrutiny applicable to prior restraints on speech. We agree in part.

> Prior restraints of speech, such as the order here, are not unconstitutional per se, but they bear a heavy presumption against their constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint. An attempt to effect a prior restraint is subject to exacting scrutiny. . . .[P]roperly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The

charged with such violation was not a party to the proceedings. In such a case it must be alleged and proved that the contemnor had actual notice of the order for disobedience of which he is sought to be punished.'"), quoting *Spence v. Woodman Co.*, 213 Ga. 573, 576 (3) (100 SE2d 435) (1957); *In re Ragas*, 359 Ga. App. 670, 674 (3) (a) (859 SE2d 827) (2021) ("It must be alleged and proved that the [nonparty] contemnor had actual notice of the order for disobedience of which he is sought to be punished and that the nonparty be in privity with, aid and abet, or act in concert with the named party in acts constituting a violation of the order.") (punctuation and emphasis omitted).

possibility that other measures will serve the State's interests should also be weighed.[7]

At the outset, we note that in custody proceedings courts have authority "to make prohibitive or mandatory orders, with or without notice or bond, and upon such terms and conditions as the court may deem just."[8] This authority properly and constitutionally extends to temporarily requiring "the parties in a divorce proceeding 'to refrain from making derogatory remarks about the other before the children.'"[9] And because contempt power can extend to non-parties who are nevertheless involved in the litigation,[10] we discern no error in the trial court's restriction on Kitty's ability to criticize the parties or spouses involved in the litigation or interfere with the

---

[7] (Citations and punctuation omitted.) *Baskin v. Hale*, 337 Ga. App. 420, 426 (3) (787 SE2d 785) (2016).

[8] (Punctuation omitted.) *Lacy v. Lacy*, 320 Ga. App. 739, 752 (12) (740 SE2d 695) (2013), quoting OCGA § 9-11-65 (e) (addressing interlocutory injunctions and temporary restraining orders).

[9] (Punctuation omitted.) *Lacy*, 320 Ga. App. at 752 (12), quoting *Maloof v. Maloof*, 231 Ga. 811, 812 (6) (204 SE2d 162) (1974).

[10] See, e.g., *In re Ragas*, 359 Ga. App. at 674 (3) (a), citing *Murphy v. Murphy*, 330 Ga. App. 169, 176-177 (6) (a) (ii) (767 SE2d 789) (2014).

children's bond with the Mother. To the extent that paragraphs 28 and 29 reach such conduct, they survive Kitty's motion to strike.

But paragraphs 28 and 29 go farther. For example, paragraph 28 forbids Kitty from "discuss[ing] this litigation . . . with anyone at any time" outside of a therapeutic context. This prohibition, on its face, reaches even discussions with counsel or other unrelated people regardless of the presence of any negative content in the communication. Because this is a facially overbroad restriction that is not calibrated with "the danger said to flow from the particular utterance,"[11] we conclude that, to the extent that the restriction does not implicate harm to the children or their relationships with the parties, the trial court erred by denying Kitty's motion to strike this kind of restriction.[12]

In summary, to the extent that the Consent Order restricts Kitty's ability to criticize the parties involved in the litigation or otherwise undermine the efficacy of the proceedings, we affirm the denial of Kitty's motion to strike. To the extent that

---

[11] *Baskin*, 337 Ga. App. at 426.

[12] Cf. *Baskin*, 337 Ga. App. at 428 (3) ("[W]e cannot condone the superior court's attempt in this case to restrict the parties' and lawyers' right to publicly criticize the court and the litigation for the next ten years.").

the Consent Order reaches speech by Kitty in a context that does not undermine the outcomes or efficacy of these proceedings in any way and does not impact the children's ability to bond with the Mother, we reverse the denial of Kitty's motion to strike. We emphasize that although our ruling is a partial "win" for Kitty, it is a narrow one, and Kitty should be guided by the spirit of the trial court's order if not every letter. The trial court will be the arbiter of any contempt proceeding, and this Court will affirm such rulings absent an abuse of the trial court's discretion.[13]

### Case No. A23A1660

In this case, the Father appeals from a series of orders mostly stemming from contempt proceedings that began in 2022.[14] We address each in turn.

---

[13] See generally *Vaughn v. Vaughn*, 365 Ga. App. 195, 198 (1) (877 SE2d 860) (2022) ("[T]he trial court in a contempt case has wide discretion to determine whether its orders have been violated. The court is not authorized to modify a previous decree in a contempt order, but it is always empowered to interpret and clarify its own orders. If there is any evidence to support a trial court's determination that its order has been willfully violated, this Court must affirm that determination on appeal.").

[14] The Mother argues that we lack jurisdiction to address this appeal because the Father did not follow the discretionary application procedure in OCGA § 5-6-35 (a) (2), and the Mother argues, this is a divorce or domestic relations case. But this action was initiated by the Mother's petition to modify custody, so it is a "child custody" case directly appealable under OCGA § 5-6-34 (a) (11), which allows for the direct appeal of contempt orders in child custody cases. See *Moore v. Moore-McKinney*, 297

11

3. The Father first argues that the trial court erred by denying his motion to recuse filed in May 2023. Specifically, the Father asserts that his motion to recuse met the threshold requirements and should have been referred to another judge for review. Based on the record in this case, we disagree.

> [Uniform Superior Court Rule ("USCR")] 25.3 directs that when the trial judge assigned to a case is presented with a recusal motion and an accompanying affidavit, the judge shall temporarily cease to act upon the merits of the matter and determine immediately: (1) whether the motion is timely [, i.e., within five days after the affiant first learned of the alleged grounds for recusal]; (2) whether the affidavit is legally sufficient; and (3) whether the affidavit sets forth facts that, if proved, would warrant the assigned judge's recusal from the case. If all three criteria are met, another judge shall be assigned to hear the motion to recuse. The decision about referring a recusal motion for reassignment to another judge does not involve an exercise of discretion by the judge whose recusal is sought. Rather, whether the three threshold criteria have been met is a question of law, which an appellate court reviews de novo.[15]

Further,

---

Ga. App. 703, 707 (1) (678 SE2d 152) (2009).

[15] (Citations and punctuation omitted.) *Mondy v. Magnolia Advanced Materials, Inc.*, 303 Ga. 764, 766 (2) (815 SE2d 70) (2018).

[f]or the affidavit accompanying a recusal motion to be legally sufficient, it must contain the three elements essential to a complete affidavit . . . [and] must also fully assert the facts upon which the motion is founded and present all evidence on the motion. . . . Allegations consisting of bare conclusions and opinions that the assigned judge is biased or prejudiced for or against a party, are not legally sufficient to support a recusal motion or to justify forwarding the motion for decision by another judge. In all other respects, however, the assigned judge must take the motion at face value, treating it as though all of the facts set forth in the affidavit are true. . . . If the motion and affidavit, taken at face value, satisfy the three threshold criteria, the assigned judge must refer the motion for reassignment and may not oppose the motion.[16]

Here, the Father's motion and accompanying materials alleged that the trial judge exhibited bias based on her decision to unseal and consider certain custody evaluation reports, informing the parties that she had communicated with a custody evaluator, opining that the Mother's counsel "was right 98% of the time," threatening to jail a witness for contempt (and later crudely referring to the witness's emotional upset after the hearing), threatening to jail parties for contempt, questioning witnesses, asking counsel for the Mother why she was not objecting to certain testimony, criticizing the Father's litigation tactics and the perceived "marching

---

[16] (Citations and punctuation omitted.) Id. at 766-768 (2).

13

orders" of the Father to his counsel, and entering an order to seal the record in the case.

> Taking these allegations as true, they all focus on
>
> the trial judge's factual and legal rulings . . . , which are not a proper basis for recusal. Judicial rulings adverse to a party are not disqualifying, as the alleged bias must stem from an extra-judicial source and result in an opinion based on something other than what the judge learned from participating in the case.[17]

Likewise, "opinions about the judge's tone and facial expressions during the hearing, . . . are equally insufficient" to warrant recusal.[18] While an alleged crude remark about a witness by a trial judge is not professional, the single remark as alleged does not evince an extra-judicial bias based on something outside of the proceedings. Accordingly, this enumeration presents no basis for reversal.[19]

---

[17] (Punctuation omitted.) *Mondy*, 303 Ga. at 779 (5).

[18] Id.

[19] See id. at 779-780 (5). See also *Postell v. Alfa Ins. Corp.*, 332 Ga. App. 22, 24-25 (1) (772 SE2d 793) (2015), citing *Schlanger v. State*, 297 Ga. App. 785, 786 (1) (678 SE2d 190) (2009) ("[A] merely erroneous order cannot by itself justify the grant of a motion to recuse.").

4. The Father next contends that the trial court erred when it entered an order in May 2023 ("Contempt Order"), finding him in contempt and ordering his incarceration for violating the Consent Order. The Father points out that the trial court issued the Contempt Order after Kitty had filed her notice of appeal challenging the restrictions on her speech addressed in Case No. A23A1562 and after this Court had granted her application for a discretionary appeal. Because the Father never appealed the Consent Order, we disagree.

To recap the relevant procedural posture, and as summarized above in Case No. A23A1562, the Consent Order was entered in June 2022, and amended in July 2022. In November 2022, Kitty moved to strike the Consent Order as to the restrictions on her own speech. In February 2023, the trial court denied Kitty's motion to strike and granted her a certificate of immediate review. After this Court granted Kitty's application for discretionary review, Kitty filed her notice of appeal in April 2023. Meanwhile, the Mother had filed the relevant contempt petition in October 2022, and following a hearing in May 2023, the trial court entered the Contempt Order against the Father the same month.

The Father points out that the contempt hearing and order entry both took place after Kitty filed her application for discretionary appeal and her subsequent notice of appeal challenging the denial of her motion to strike. Generally,

> [t]he filing of an application for appeal shall act as a supersedeas to the extent that a notice of appeal acts as supersedeas. And, as a general rule, in civil actions other than injunctions, a trial court, upon the filing of a notice of appeal, loses jurisdiction to modify or enforce a judgment [that] is the subject of the appeal during the period of supersedeas. Essentially, *the supersedeas that results from the filing of an application to appeal or a notice of appeal deprives the trial court of jurisdiction to take action in the case that would affect the judgment on appeal.*[20]

Here, the judgment on appeal in Kitty's case was the denial of her motion to strike the unconstitutional portions of the Consent Order as they applied to her. The Father did not moved to strike the Consent Order, nor did he appeal its applicability. "[T]he notice of appeal supersedes only the judgment appealed; it does not deprive the trial court of jurisdiction as to other matters in the same case not affecting the

---

[20] (Citations and punctuation omitted; emphasis supplied.) *Long v. Truex*, 349 Ga. App. 875, 880 (2) (827 SE2d 66) (2019).

judgment on appeal."[21] Further, it is important to note that the order at issue was a temporary consent order entered into by the Mother and Father in a child custody case. Such orders are common and "bind[] the parties pending decision and appeal of the final judgment. Such a temporary order is enforceable through contempt proceedings pending review of the divorce [or custody] judgment in this court."[22] Otherwise, a party to a pending custody dispute could undo the status quo to which he consented by appealing the temporary order he negotiated during the pendency of the litigation, and trial courts would have no power to enforce temporary custody arrangements. Based on the procedural posture in this case, we conclude that Kitty's appeal did not prevent the trial court from enforcing the temporary Consent Order against the Father.

5. The Father also contends that the finding of contempt was unsupported by the evidence. We disagree.

---

[21] (Punctuation omitted.) *Gist v. Dekalb Tire Co.*, 226 Ga. App. 758, 759 (1) (487 SE2d 360) (1997), citing *Cohran v. Carlin*, 249 Ga. 510, 512 (291 SE2d 538) (1982).

[22] (Citations omitted.) *Walker v. Walker*, 239 Ga. 175, 176 (236 SE2d 263) (1977). See also *Franklin v. Franklin*, 294 Ga. 204, 208 (3) (751 SE2d 411) (2013) ("We find that the trial court retained the authority to hold Wife in contempt for failing to meet her child support obligations as they existed in the temporary order while she challenged the trial court's Final Decree.").

17

[T]he question of whether a contempt has occurred is for the trial court, and its determination will be overturned only if there has been a gross abuse of discretion. Once an act has been determined to constitute contempt of court, the action the court takes to deal with the contempt determines whether the contempt is deemed 'criminal' contempt or 'civil' contempt. The distinction between criminal and civil contempt is that criminal contempt imposes unconditional punishment for prior contempt, to preserve the court's authority and to punish disobedience of its orders. Civil contempt, on the other hand, is conditional punishment which coerces the contemnor to comply with the court order.[23]

In this case, the Father was ordered to pay $1,000 and serve 20 days in jail for each of three acts found to be contemptuous by the trial court. This unconditional punishment for three violations of a prior order was a finding of criminal contempt. "On appeal of a criminal contempt conviction the appropriate standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[24]

---

[23] (Citations and punctuation omitted.) *Stardust, 3007, LLC v. City of Brookhaven*, 348 Ga. App. 711, 711-712 (824 SE2d 595) (2019).

[24] (Punctuation omitted.) *Murphy*, 330 Ga. App. at 176 (6) (a) (ii).

The trial court based its contempt finding on three violations of the Consent Order: telling the children that he would go to jail if he did not agree to the Consent Order, telling the children that the court did not allow him to tell his side of the story, and talking to a friend of the children about their relationship with the Mother. Viewing the record in favor of the trial court's findings, there was testimony at the contempt hearing from a therapist showing that the children had revealed that the Father had told them that he was not allowed to fully present his side of the case to the court and that he had to enter into the Consent Order to avoid going to jail. There was additional testimony from the Father and Kitty showing that the Father had discussed the children with one of the children's friends, including references to false allegations exchanged between the Mother and Kitty. This testimony supported findings that the Father had violated the Consent Order by undermining the reunification process and negatively discussing the litigation with the children as well as criticizing the process and the Mother with a friend of the children. Given this record, this enumeration presents no basis for reversal.[25]

---

[25] See id. at 176-177 (6) (a) (ii).

6. The Father contends that the trial court erred by entering orders sealing the record on January 7, 2019; February 20, 2019; December 2, 2020; and May 12, 2023. We agree in part.

The record shows, and it is undisputed on appeal, that the parties consented to certain custody and psychosexual evaluations performed by therapists and reunification counselors, that those records would remain confidential, and that they could be sealed on motion by a party and approval by the court. In light of this, the Father is not now in a position to challenge the sealing of those orders.[26]

With respect to sealing the entire record without the prior consent of the parties, courts must follow the procedure outlined in USCR 21 which states, in part,

> that upon motion of a party or on the trial court's own motion *and after hearing*, the court may limit access to court files respecting that action. However, an order limiting access shall not be granted except upon a finding that the harm otherwise resulting to the privacy of a person in interest clearly outweighs the public interest, and the court is required in its sealing order to specify the part of the file to which access is limited, the nature and duration of the limitation, and the reason for

---

[26] See generally OCGA § 1-3-7 ("[A] person may waive or renounce what the law has established in his favor when he does not thereby injure others or affect the public interest."); *Dept. of Transp. v. Smith*, 210 Ga. App. 741, 746 (5) (437 SE2d 811) (1993) (agreement in consent order waived later procedural challenge).

limitation. *It is not enough for the court simply to recite in the sealing order the standard* set out in USCR 21.2. Rather, the court must set forth findings that explain how the invasion of privacy threatened by public access to the sealed materials differs from the type of privacy invasion that is suffered by all parties in civil suits.[27]

Here, it is undisputed that the trial court did not engage in this process. Accordingly, we vacate the sealing orders not consented to by the parties and remand for further proceedings in accordance with USCR 21.[28]

7. The Father also argues that the trial court erred by overruling his objection to testimony by him and by Kitty that was subject to marital privilege. But, pretermitting whether the trial court erred under the circumstances of this case and the Consent Order entered into by the Father, the portions of the transcript to which the Father cites reveal no testimony relevant to the contempt findings listed by the trial court in the May 2023 order against him (making certain statements to the

---

[27] (Citations and punctuation omitted; emphasis supplied.) *Altman v. Altman*, 301 Ga. 211, 216-217 (3) (800 SE2d 288) (2017). Compare *Fedina v. Larichev*, 322 Ga. App. 76, 80 (3) (744 SE2d 72) (2013) (holding that a party waived the issue because she "did not seek access to the records before or during the trial, nor did she object to the order sealing the documents"). Because this case is still pending, we find no waiver.

[28] See *Altman*, 301 Ga. at 218 (3).

children and their friend) nor any of the other substantive orders he challenges on appeal. Absent a showing of how this testimony harmed the Father, we discern no reversible error.[29]

8. The Father next assigns as error the trial court's remark that the Father did not need to subpoena the children in light of the no-contact provision in effect at the time, and he challenges an un-transcribed, in-chambers conversation had by the trial court with the children. First, nothing indicates that the trial court's comment that the Father did not need to subpoena the children limited any argument or evidence presented by the Father — it was merely a procedural colloquy that did not amount to a ruling affecting the Father's rights pertinent to this appeal.[30] Second, with respect to the in-chambers conversation, the Father's appellate brief argues that it would be error "if the trial court considered the children's testimony." But he does not point to any portion of the record showing that the trial court did consider the in-chambers

---

[29] See *Cockerham v. Cockerham*, 359 Ga. App. 891, 900-901 (5) (860 SE2d 163) (2021) ("A case will not be reversed merely because error may have occurred. The father is required to show harm as well as error to prevail on appeal, and this he must show by the record as harm cannot be established by unsupported assertions.") (punctuation omitted).

[30] See id.

conversation or how it impacted the contempt findings. Accordingly, this enumeration fails to demonstrate reversible error.[31]

9. The Father also argues that the trial court erred by considering the written reports of two psychologists involved in the case, Dr. Kevin Baldwin, who performed a psychosexual evaluation of the Mother, and Dr. Nancy McGarrah, who performed a custody evaluation of the parties. The Father argues that it was error for the court to consider their reports because he did not have a chance to cross-examine them regarding their reports. But the portion of the transcript relied on by the Father reveals that he had Baldwin under subpoena and on stand-by to testify, and although he had not subpoenaed McGarray, he was allowed an opportunity by the court to subpoena McGarrah to testify the next day. At the conclusion of this colloquy, the Father's counsel replied, "Ok. All right. Thank you. I understand."[32] Further, these experts were involved in the case pursuant to consent orders agreed to by the Father.

---

[31] See id. Compare *Altman*, 301 Ga. at 216 (2) ("It is apparent from this order, as well as other comments the court made at the final hearing. . .that . . . the court took into account what the children said in chambers.").

[32] We note that at the next day of the hearing, the Father renewed his objection to McGarrah's report, but he had not availed himself of the opportunity to obtain McGarrah's testimony on cross-examination.

Based on this record, and the Father's acceptance of the trial court's procedure when first announced, his present challenge to the trial court's consideration of the reports presents no basis for reversal.[33]

10. The Father next argues that the trial court erred when it consulted with an independent expert, Dr. Barry Alexander. At one point in a hearing regarding a motion by the Mother seeking visitation and reunification therapy, the trial court indicated that it had arranged for a telephone conversation with Alexander, an independent psychologist who was under consideration to take over reunification therapy. No objection was made at that time, and the following day, the following colloquy occurred:

Counsel for the Father: . . . There was that call to Dr. Barry Alexander.

Court: You're right.

Counsel: And so that means you understood that – that Barry Alexander was at least mentioned in that order?

---

[33] See *Day v. Mason*, 357 Ga. App. 836, 846 (5) (b) (851 SE2d 825) (2020), citing *Gnam v. Livingston*, 353 Ga. App. 701, 703 (2) (839 SE2d 200) (2020) ("A party cannot acquiesce in a procedure by a trial court and then complain of it. Failure to object to the procedure amounts to a waiver.").

Court: No, it had nothing to do with her being mentioned. It had to do — I wanted her advice on scenario. She doesn't — I mean, because I trust her advice, because I — I wanted her, and I told you, I just, I called. I called. I wasn't about to call Nancy McGara, or I wouldn't have called . . . Dr. Baldwin [the experts involved in the case]. I mean — but I called Dr. Alexander to get direction on what I viewed the — the record. I mean, I — I've seen the record. I reviewed the record and how to reunify these boys with their mom — I mean, your client is clear. Your marching orders are to do anything you can to destroy the mom.

Counsel: That's not my marching orders at all.

Court: Your marching orders are to go to juvenile court to try to terminate her rights. . . . Your marching orders are to slam a colleague because she made a mistake. That's your marching orders. Because I don't believe that came from you, because I know you. . . . Those are your marching orders. . . .

Counsel: Judge, can I have some time to confer with my client?

Court: Sure.

After a short recess, the Father's attorney requested a conference in chambers with opposing counsel, but absent an agreement to further delay the proceedings, the trial

court declined to hold the conference, and the proceedings resumed. The Father's counsel made no objection to the court's consultation with Dr. Alexander.

Based on this record, including the oral notice to the parties about the telephone conversation, the upcoming role of Dr. Alexander in the process, and the lack of objection by the Father, we discern no basis for reversal.[34] Nevertheless, we note that such communications are ill advised and potentially in violation of the Code of Judicial Conduct Rule 2.9.[35]

11. Finally, the Father argues that the trial court should have granted his motion to modify or vacate the Consent Order because it contained improper self-executing custody provisions. Such orders have been held to be against public policy because they lack sufficient grounds when not based on the best interest of the children.[36]

---

[34] See *Brennan v. State*, 313 Ga. 345, 355 (3) (868 SE2d 782) (2022).

[35] Rule 2.9 provides, in part: "Judges shall not initiate, permit, or consider ex parte communications, or consider other communications made to them outside the presence of the parties, or their lawyers, concerning a pending proceeding or impending matter," subject to certain exceptions.

[36] See generally *Scott v. Scott*, 276 Ga. 372, 375 (578 SE2d 876) (2003) ("While self-executing change of custody provisions are not expressly prohibited by statutory law, we hold that any such provision that fails to give paramount import to the child's best interests in a change of custody as between parents violates this State's public policy.").

Here, the Consent Order contained a provision that required the Father to work through an aftercare reunification program with Dr. Alexander, who paused the program at certain times. The Father points to the fact that these visitation rights depended in part on Dr. Alexander's supervision of the program; thus, he argues that the custody provision in favor of the Mother was "self-executing." But the order was not a final custody order; instead it was an interloctory order consented to by the Father. Moreover, the Consent Order explicitly states that "it is the Court who shall determine the conditions, timing and nature of the resumption of the contact between the children and the Father with the assistance and input from the [reunification therapist] and any of the children's [family workshop] professionals." Thus, it is plain that the Custody Order is not an improper "self-executing" custody order, and the trial court did not err by relying on experts involved in family therapy and other aspects of the reunification process. Accordingly, this argument is without merit.

*Judgment affirmed in part and reversed in part in Case No. A23A1562; judgment vacated in part and case remanded in Case No A23A1660. Gobeil, J., and Senior Judge C. Andrew Fuller concur.*